# United States Court of Appeals
## For the First Circuit

─────────────

No. 19-1130

DANELL TOMASELLA, on behalf of herself and
all others similarly situated,
Plaintiff, Appellant,

v.

NESTLÉ USA, INC., a Delaware corporation,
Defendant, Appellee.

─────────────

No. 19-1131

DANELL TOMASELLA, on behalf of herself and
all others similarly situated,
Plaintiff, Appellant,

v.

MARS, INC., a Delaware corporation; and MARS CHOCOLATE
NORTH AMERICA LLC, a Delaware company,
Defendants, Appellees.

─────────────

No. 19-1132

DANELL TOMASELLA, on behalf of herself and
all others similarly situated,
Plaintiff, Appellant,

v.

THE HERSHEY COMPANY, a Delaware corporation;
HERSHEY CHOCOLATE & CONFECTIONERY CORPORATION,
a Delaware corporation,
Defendants, Appellees.

─────────────

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

————————————

Before

Torruella, Lynch, and Kayatta,
Circuit Judges.

————————————

Elaine T. Byszewski, with whom Steve W. Berman, and Hagens Berman Sobol Shapiro LLP were on brief, for appellant.

Bryan A. Merryman, with whom Michael Kendall, Lauren M. Papenhausen, Karen Eisenstadt, and White & Case LLP were on brief, for appellee Nestlé USA, Inc.

David M. Horniak, with whom Alison M. Newman, Stephen D. Raber, and Williams & Connolly LLP were on brief, for appellees Mars, Inc. and Mars Chocolate North America LLC.

Jonah M. Knobler, with whom Steven A. Zalesin, and Patterson Belknap Webb & Tyler LLP were on brief, for appellees The Hershey Company and Hershey Chocolate & Confectionery Corporation.

————————————

June 16, 2020

————————————

   **TORRUELLA**, **Circuit Judge**. Danell Tomasella ("Tomasella")
appeals the district court's dismissal of her claims in three
putative class action lawsuits against Nestlé USA, Inc.
("Nestlé"), Mars, Inc. ("Mars"), and The Hershey Company
("Hershey") (collectively "Defendants"). Tomasella alleged that
Defendants' failure to disclose on the packaging of their chocolate
products that the worst forms of child labor exist in their cocoa
supply chains violates the Massachusetts Consumer Protection Act,
Mass. Gen. Laws ch. 93A ("Chapter 93A"). She also alleged that
Defendants had been unjustly enriched by this packaging omission.

   The exploitation of children in the supply chain from
which U.S. confectionary corporations continue to source the cocoa
beans that they turn into chocolate is a humanitarian tragedy.
This case thus serves as a haunting reminder that eradicating the
evil of slavery in all its forms is a job far from finished.
Before us, however, is the very narrow question of whether
Defendants' failure to include on the packing of their chocolate
products information regarding upstream labor abuses in their
cocoa bean supply chains constitutes an unfair or deceptive
business practice within the meaning of Chapter 93A. Because we
agree with the district court that Tomasella has not plausibly
stated a claim for relief under Chapter 93A based on the alleged
packaging omissions, and that Tomasella's unjust enrichment claim

-3-

is foreclosed by the availability of a remedy at law, we affirm the dismissal of her complaints against Defendants.

<h2 align="center">I. <u>Background</u></h2>

**A. Facts of the Case**

Because this is an appeal from the granting of a motion to dismiss, "we rehearse the facts as they appear in the plaintiff['s] complaints (including documents incorporated by reference therein)."[1] <u>Hochendoner</u> v. <u>Genzyme Corp.</u>, 823 F.3d 724, 728 (1st Cir. 2016).

The West African nation of Côte d'Ivoire (Ivory Coast) is the world's largest producer of cocoa beans, the essential ingredient in chocolate. The United States imports 47% of its supply of cocoa beans from Côte d'Ivoire. According to the U.S. Department of Labor's ("DOL") Bureau of International Labor Affairs, the Ivorian cocoa industry "employ[s]" over 1.2 million child laborers, 95% of whom are engaged in hazardous cocoa production work, such as burning and clearing fields, using machetes and sharp tools, spraying pesticides, and carrying heavy loads. As many as 4,000 of these children "are working under conditions of forced labor on Ivorian cocoa farms," having been

---

[1] We draw the factual background largely from the complaint against Nestlé -- a template for the nearly identical complaints that Tomasella filed against Mars and Hershey.

kidnapped or trafficked into debt bondage marked by harsh working conditions. In addition, child laborers on cocoa farms are often forced to work long hours even when sick, denied food, and punished with physical abuse. A DOL-funded 2015 report prepared by the Payson Center for International Development at Tulane University found that over half of child laborers on Ivorian cocoa farms have suffered work-related injuries. These conditions, according to Tomasella, amount to "the Worst Forms of Child Labor" and are "prohibit[ed]" under international law.[2]

Defendants are three of the largest and most profitable confectionary corporations in the United States. Their chocolate products are made with cocoa beans and paste that they source (either directly or through intermediaries) predominantly from West African countries such as Côte d'Ivoire and Ghana.[3]

---

[2] International Labor Organization ("ILO") Convention No. 182 defines the "Worst Forms of Child Labor" to include slavery, trafficking of children, forced or compulsory labor, prostitution and pornography, drug trafficking, or work, which by its nature, is likely to harm children's health and safety. ILO: Convention Concerning the Prohibition and Immediate Elimination of the Worst Forms of Child Labor, 38 I.L.M. 1207, 1208 (1999).

[3] Tomasella specifically identifies the following assortment of each company's chocolate products in her complaints: (1) Nestlé Crunch, 100 Grand, Baby Ruth, Butterfinger, Nestlé Toll House, Nestlé Hot Cocoa Mix, Nestlé Milk Chocolate, and Nestlé seasonal confections; (2) M&M's, Mars Bars, Snickers, Twix, 3Musketeers, Galaxy, and Milky Way; (3) Hershey's Bars, Hershey's Kisses, Reese's, KitKat, Rolo, Heath, Skor, Special Dark, Krackel, Milk Duds, Whoppers, Mr. Goodbar, Almond Joy, Mounds, 5th Avenue, Symphony, Take5, Whatchamacallit, York Peppermint Patty, seasonal

Defendants' Corporate Business Principles and Supplier Codes of Conduct prohibit child and slave labor. Additionally, they each have a stated policy that condemns the use of the worst forms of child labor. At the same time, Defendants publicly acknowledge the existence of the worst forms of child labor in their West African cocoa supply chains. For example, Nestlé acknowledges that children are engaged in hazardous work and forced labor on farms in Côte d'Ivoire in areas where the company sources cocoa. Mars recognizes that child labor and trafficking exist in cocoa bean supply chains originating in West Africa, and that it has advocated for the government of Côte d'Ivoire to address the problem. Hershey concedes that there are potential labor rights abuses in its cocoa bean supply chain and expresses its commitment to ending forced labor.

In 2001, Defendants (all members of the Chocolate Manufacturers Association) signed the Protocol for the Growing and Processing of Cocoa Beans and Their Derivative Products in a Manner that Complies with ILO Convention 182 Concerning the Prohibition and Immediate Action for the Elimination of the Worst Forms of Child Labor, Sept. 19, 2001 [hereinafter Harkin-Engel Protocol],[4]

---

confections, and Hershey's baking bars, syrups, and spreads.

[4] The Harkin-Engel Protocol is named after U.S. Senator Tom Harkin and U.S. Representative Eliot Engel, the legislators who brokered

whereby they committed to being able to publicly certify by July 2005 "that [their] cocoa beans and their derivative products have been grown and/or processed without any of the worst forms of child labor."    Since 2005, Defendants have issued several joint statements affirming their commitment to eliminating forced child labor in the cocoa supply chain, although they have yet to fully implement the comprehensive cocoa certification process imagined by the Harkin-Engel Protocol.

As part of their commitment, Defendants have launched corporate remedial initiatives.    Nestlé launched the Nestlé Cocoa Plan in 2009 to "eliminate the use of child labour" and "stamp out forced labour practices" in the Ivorian cocoa industry.    Mars has the Sustainable Cocoa Initiative, which aims to improve the livelihoods of farmers.    Hershey designed the Shared Goodness approach, "to help guide [its] support of the United Nations Sustainable Development Goals" towards the ultimate goal of creating a "Better Life and a Bright Future for [its] stakeholders."    Tomasella alleges that the total number of children involved in hazardous work in cocoa production has nevertheless increased between 2008 and 2014.

Defendants contend that they have consistently and

---

the agreement.

publicly acknowledged the child labor problem in their cocoa supply chains, including on their websites, where they regularly report on their remedial efforts; however, they do not disclose the existence of "child and/or slave labor in the [cocoa] supply chain" on the packaging of the chocolate products identified in Tomasella's complaints at the point of sale.  Nestlé does label at least one of its chocolate products, Nestlé Crunch, with the Nestlé Cocoa Plan logo and a statement (with a website link) that reads, "[t]he Nestlé Cocoa Plan works with UTZ Certified to help improve the lives of cocoa farmers and the quality of their products."[5]  Both Mars and Hershey label certain products as certified by the Rainforest Alliance (another certification that does not permit child labor), but Tomasella expressly exempts those products from challenge in her complaints.

**B.  Procedural History**

On February 12, 2018, Tomasella (a Massachusetts resident) filed a two-count class action lawsuit against Nestlé in federal court predicated on diversity jurisdiction.  Then, on February 26, 2018, she filed identical class actions against Mars and Hershey.  The putative class in all three lawsuits included "[a]ll consumers who purchased [Defendants'] Chocolate Products in

---

[5] UTZ is a non-profit organization that operates a fair labor and sustainability certification system.

Massachusetts during the four years prior to the filing of the complaint[s]."

First, Tomasella alleged that Defendants violated Chapter 93A because their failure to disclose the prevalence of the worst forms of child labor in their cocoa supply chains on their product packaging is a "material omission[]" that constitutes "an unfair or deceptive act[] or practice[] in the conduct of any trade or commerce" (Count One). Mass. Gen. Laws ch. 93A, § 2(a).[6] According to Tomasella, these omissions were deceptive because they "enticed reasonable consumers to purchase the Chocolate Products when they would not have had they known the truth." Likewise, she alleged that the omissions were unfair to consumers who became "unwitting support[ers] of child and slave labor" through their purchases, and that Defendants' "undisclosed participation" in a cocoa supply chain plagued by the worst forms of child labor was "immoral, unethical, oppressive, unscrupulous, unconscionable, and offends established and internationally recognized public policies against the use of child and slave labor," such as ILO Convention No. 182 and the United Nations'

---

[6] Chapter 93A creates a private right of action under which "[a]ny person . . . who has been injured . . . may bring an action . . . for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper." Mass. Gen. Laws ch. 93A, § 9.

1948 Universal Declaration on Human Rights ("UDHR"). Tomasella also alleged that Defendants' packaging omissions "impair[] competition in the market for chocolate products, and prevent[] [her] and Class Members from making fully informed decisions about the kind of chocolate products to purchase and the price to pay for such products."

In the way of injuries, Tomasella claimed that Defendants' material omissions caused her and the putative class members to lose money "because they would not have purchased nor paid as much for Chocolate Products had they known the truth." Tomasella also alleged that "the unwitting support of child and slave labor causes substantial injury to consumers" -- presumably in a moral sense. As for the requested relief, Tomasella sought an injunction ordering Defendants to discontinue their deceptive and unfair omissions (i.e., an injunction ordering them to make certain disclosures on their chocolate wrappers) and requesting treble damages, as well as attorneys' fees and costs.

In the second cause of action, Tomasella alleged that Defendants had been "unjustly enriched" by "receiving payments for Chocolate Products that would not have been possible absent the wrongful conduct" (Count Two). Accordingly, Tomasella sought "full restitution" of Defendants' "ill-gotten gains."

On April 19, 2018, Defendants simultaneously filed motions to dismiss Tomasella's complaints in their respective cases under Fed. R. Civ. P. 12(b)(6). They uniformly asserted that Tomasella failed to state a Chapter 93A claim because she did not plausibly plead that the alleged packaging omissions constituted unfair or deceptive acts within the meaning of the statute, see Mass. Gen. Laws ch. 93A, § 2(a); that Tomasella had not alleged a cognizable injury per section 9 of Chapter 93A, see Mass. Gen. Laws ch. 93A, § 9; that the disclosure Tomasella sought would violate Defendants' First Amendment rights; and that Tomasella could not claim unjust enrichment -- an equitable remedy -- because Chapter 93A provided her and the putative class members an adequate remedy at law.

On January 30, 2019, the district court granted Defendants' motions to dismiss with prejudice. See Tomasella v. Nestlé USA, Inc., 364 F. Supp. 3d 26, 37 (D. Mass. 2019); Tomasella v. Mars, Inc., No. 18-cv-10359 (D. Mass. Jan. 30, 2019); Tomasella v. The Hershey Co., No. 18-cv-10360 (D. Mass. Jan. 30, 2019).

## C. The District Court's Decision[7]

The district court dismissed Tomasella's complaints in three strokes. First, the court found that Tomasella "failed to

---

[7] To lay out the district court's holding and reasoning, we refer to the Nestlé decision, which is the only published decision of

state a deceptive claim under Chapter 93A because it is not plausible that [Defendants'] failure to disclose information about the labor practices in [their] supply chain[s] at the point of sale could have the 'capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted (i.e., to entice a reasonable consumer to purchase the product).'" Id. at 35 (quoting Aspinall v. Philip Morris Cos., 813 N.E.2d 476, 488 (Mass. 2004)). The court noted that Tomasella's theory of liability was premised on factual omissions (as opposed to "affirmative misrepresentation[s]" or "misleading half-truth[s]") that were tangential to the "central characteristics of the chocolate products sold, such as their physical characteristics, price, or fitness for consumption." Id. at 33.

Heeding Chapter 93A's instruction that courts be "guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1))," Mass. Gen. Laws ch. 93A, § 2(b), the district court looked to the Federal Trade Commission's ("FTC") decision in In re International Harvester Co., 104 F.T.C. 949, 1059 (1984) (hereinafter "International Harvester"), in the

---

the three, and which mirrors the other two.

absence of any suggestion by the parties of Massachusetts case law addressing the type of omission at issue in this case. In International Harvester, the FTC concluded that a "pure omission," which it defined as "a subject upon which the seller has simply said nothing, in circumstances that do not give any particular meaning to his silence," did not create deception liability under the Federal Trade Commission Act ("FTC Act"). Int'l Harvester, 104 F.T.C. at 1051-55.  Accordingly, the district court construed Defendants' nondisclosure on their product packaging of any information relating to child labor in their cocoa bean supply chains as a "pure omission" because "[Defendants'] act of offering chocolate for sale implies that the product is fit for human consumption . . . but does not on its own give rise to any misleading impression about how [Defendants] or [their] suppliers treat their workers."  Nestlé, 364 F. Supp. 3d at 35.  Thus, the district court held that "it would not be objectively reasonable for a consumer to affirmatively form any preconception about the use of child or slave labor in [Defendants'] supply chain[s], let alone to make a purchase decision based on any such preconception" because of Defendants' silence about their labor practices on the packaging of their chocolate products.  Id.

Second, the district court determined that Tomasella likewise "[did] not state a claim for unfair conduct upon which

relief could be granted under Chapter 93A" because she failed to allege that (1) "[Defendants'] omissions [were] within the penumbra of any common law, statutory or other established concept of unfairness"; (2) "the challenged omissions [were] immoral, unethical, oppressive or unscrupulous"; or that (3) "[Defendants] caused substantial injury to [their] customers."  Id. at 35-36 (citing President & Fellows of Harvard Coll. v. Certplex, Ltd., No. 15-cv-11747, 2015 WL 10433612, at *2 (D. Mass. Nov. 25, 2015)).

The district court rejected Tomasella's argument that Defendants' conduct fell within "well-established international concepts of unfairness."  Id. at 36.  To that end, the court noted that Tomasella was challenging the omission of information on Defendants' product packaging relating to the existence of child and slave labor in Defendants' cocoa supply chains not the use of those abhorrent labor practices themselves.  See id.  Moreover, the district court found that Tomasella had not "identified any common law or statutory authority requiring such disclosure[s]." Id. (citing Hodsdon v. Mars, Inc., 891 F.3d 857, 867 (9th Cir. 2018)) (holding that the packaging of products is too far removed from the United Nations' and ILO's policies to serve as the basis for an unfairness claim under California's Unfair Competition Law).  Finally, the district court concluded that Tomasella's concession that Defendants had "repeatedly disclosed" in other

media the existence of child and slave labor in their cocoa supply
chains neutralized her claim that she would not have purchased
Defendants' chocolate products had she known the truth about their
labor practices; moreover, where such information was "readily
available to consumers on [Defendants'] websites," the district
court held that omitting it from the packaging of chocolate
products was not "immoral, unethical, oppressive, unscrupulous or
substantially injurious to consumers."  Id.

Having dismissed both Chapter 93A claims for failure to
state a claim for unfair or deceptive conduct upon which relief
could be granted, the district court declined to address whether
Tomasella had alleged a cognizable injury per section 9 of Chapter
93A or whether the First Amendment barred compelling the packaging
disclosures she sought.  Id. at 36 n.7.

Third, the district court dismissed Tomasella's unjust
enrichment claim because, under Massachusetts law, plaintiffs with
"an adequate remedy at law cannot maintain a parallel claim for
unjust enrichment, even if that remedy is not viable."  Id. at 37
(citing Shaulis v. Nordstrom, Inc., 865 F.3d 1, 16 (1st Cir. 2017))
("It is the availability of a remedy at law, not the viability of
that remedy, that prohibits a claim for unjust enrichment.").  In
any event, because Tomasella failed to allege wrongful conduct
under Chapter 93A, the court noted that the allegation of unjust

-15-

enrichment was ultimately merely "conclusory."  Id. (internal quotation marks omitted).

On January 31, 2019, Tomasella timely appealed all three dismissals.  Due to the symmetry in the complaints, the district court decisions, and the issues on appeal, our decision addresses the three appeals as one.

## II.  Discussion[8]

On appeal, Tomasella challenges the dismissal of her Chapter 93A and common law unjust enrichment claims.  Our review is de novo.  See Shaulis, 865 F.3d at 5-6 (citing Carter's of New Bedford, Inc. v. Nike, Inc., 790 F.3d 289, 291 (1st Cir. 2015)).  "Setting aside any statements that are merely conclusory, we construe all factual allegations in the light most favorable to the non-moving party to determine if there exists a plausible claim upon which relief may be granted."  Woods v. Wells Fargo Bank, N.A., 733 F.3d 349, 353 (1st Cir. 2013) (citing Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011)).  "As a federal court sitting in diversity, we apply the substantive law of Massachusetts, as articulated by the [Massachusetts Supreme Judicial Court]."  Shaulis, 865 F.3d at 6 (citing Sanders v. Phoenix Ins. Co., 843 F.3d 37, 47 (1st Cir. 2016)).  "Where the

---

[8] Given the overlapping of issues and arguments, we refer to the briefs in the Nestlé appeal.

highest [state] court has not spoken directly on the question at issue, we must predict, as best we can, that court's likely answer." Nolan v. CN8, 656 F.3d 71, 76 (1st Cir. 2011) (citing Barton v. Clancy, 632 F.3d 9, 17 (1st Cir. 2011)).  Moreover, "our obligation to make such an 'informed prophecy' is dampened by a concomitant duty to confine our forecast 'within the narrowest bounds sufficient to permit disposition of the actual case in controversy.'"  Id. (quoting Moores v. Greenberg, 834 F.2d 1105, 1112 (1st Cir. 1987)).

## A.  Chapter 93A Claims

"Chapter 93A is a broad . . . consumer protection statute," under which "[a] plaintiff seeking relief . . . must prove that the defendant engaged in 'unfair or deceptive acts or practices in the conduct of any trade or commerce.'"  Walsh v. TelTech Sys., Inc., 821 F.3d 155, 160 (1st Cir. 2016) (quoting Mass. Gen. Laws ch. 93A, § 2(a)).  The statute does not define "unfair or deceptive acts or practices" as used in section 2(a), but it provides that courts "will be guided" by the FTC's and federal courts' interpretations of the provisions of the FTC Act that also proscribe unfair or deceptive acts or practices.  Mass. Gen. Laws ch. 93A, § 2(b).[9]

---

[9] Section 2(b) reads:

It is the intent of the legislature that in construing

-17-

Massachusetts courts also "la[y] out . . . helpful guideposts" as to the meaning of the relevant terms in section 2(a).  Hanrahran v. Specialized Loan Servicing, LLC, 54 F. Supp. 3d 149, 154 (D. Mass. 2014).  "Under Chapter 93A, an act or practice is deceptive 'if it possesses a tendency to deceive' and 'if it could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted.'"  Walsh, 821 F.3d at 160 (alteration in original) (quoting Aspinall, 813 N.E.2d at 486-87).  "[A]n act or practice is unfair if it falls 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness'; 'is immoral, unethical, oppressive or unscrupulous'; and 'causes substantial injury to consumers,'" plus the "conduct must generally be of an egregious, non-negligent nature."  Id. (quoting PMP Assocs. v. Globe Newspaper Co., 321 N.E.2d 915, 917 (Mass. 1975)).

Of additional note, "Chapter 93A liability is decided case-by-case, and Massachusetts courts have consistently

---

paragraph (a) of this section in actions brought under sections four, nine[,] and eleven, the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.

Mass. Gen. Laws ch. 93A, § 2(b).

emphasized the 'fact-specific nature of the inquiry.'"  Arthur D.
Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55 (1st Cir. 1998)
(quoting Linkage Corp. v. Trustees of Bos. Univ., 679 N.E.2d 191,
209 (Mass. 1997)).  "Although whether a particular set of acts,
in their factual setting, is unfair or deceptive is a question of
fact, the boundaries of what may qualify for consideration as a
[Chapter] 93A violation is a question of law."  Id. at 54
(alteration in original) (quoting Ahern v. Scholz, 85 F.3d 774,
797 (1st Cir. 1996)).

Section 2(c) of Chapter 93A also authorizes the
Massachusetts Attorney General to issue rules and regulations
interpreting section 2(a)'s provisions, so long as the
interpretations stay within the bounds set by the FTC's and federal
courts' interpretations per section 2(b).[10]  See Mass. Gen. Laws
ch. 93A, § 2(c).  One such regulation, which is featured in this
case, is 940 Mass. Code Regs. 3.16(2) ("Section 3.16(2)").

---

[10] Section 2(c) reads:

> The attorney general may make rules and regulations
> interpreting the provisions of subsection 2(a) of this
> chapter.  Such rules and regulations shall not be
> inconsistent with the rules, regulations[,] and
> decisions of the Federal Trade Commission and the
> Federal Courts interpreting the provisions of
> 15 U.S.C. 45(a)(1) (The Federal Trade Commission
> Act), as from time to time amended.

Mass. Gen. Laws ch. 93A, § 2(c).

Section 3.16(2) explains that Chapter 93A covers a business's "fail[ure] to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction."  940 Mass. Code Regs. 3.16(2).  The regulation does not address how such disclosures need be made.

After careful review, we agree with the district court that Tomasella has failed to plausibly state Chapter 93A claims against Defendants under either a deceptive or unfair acts theory. We address each theory in turn.

### 1.  Deceptive Acts

To plausibly state a Chapter 93A claim premised on a deceptive act, the plaintiff must allege "(1) a deceptive act or practice on the part of the seller; (2) an injury or loss suffered by the consumer; and (3) a causal connection between the seller's deceptive act or practice and the consumer's injury."  Casavant v. Norwegian Cruise Line, Ltd., 919 N.E.2d 165, 168-69 (Mass. App. Ct. 2009) (citing Mass. Gen. Laws ch. 93A, § 9).  An act or practice is deceptive if it "has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted (i.e., to entice a reasonable consumer to purchase the product)."  Aspinall, 813 N.E.2d at 488.

-20-

The spectrum of liability for deceptive acts or practices spans from affirmative misrepresentations, see Carlson, 2015 WL 6453147, at *4, to certain kinds of nondisclosures, such as "advertising [that] may consist of a half truth, or even may be true as a literal matter, but still create[s] an over-all misleading impression through failure to disclose material information," Aspinall, 813 N.E.2d at 487.  A nondisclosure, or an omission, "is the failure to 'disclose to another a fact that [one] knows may justifiably induce the other to act or refrain from acting in a business transaction . . . [if one] is under a duty to the other to exercise reasonable care to disclose the matter in question." Underwood v. Risman, 605 N.E.2d 832, 836 (Mass. 1993) (alteration in original) (quoting Restatement (Second) of Torts § 551 (1977)).

Beyond its recognition in Aspinall of two specific kinds of deceptive omissions and its occasional echoing of Section 3.16(2)'s broad disclosure language (which, as we will explain, is less expansive than meets the eye), the Supreme Judicial Court of Massachusetts ("SJC") has not squarely addressed whether a seller commits a deceptive act when omitting information at the point of sale concerning a product that is tangential to its fitness for use.  Thus, pursuant to Chapter 93A's directive, we look to the FTC's interpretation of the FTC Act for guidance.

The FTC has addressed in detail whether and to what extent omissions constitute deceptive acts. Under the FTC framework, with which Massachusetts law substantially comports, see Aspinall, 813 N.E.2d at 488, deceptive acts consist of three elements: "(1) there must be a representation, practice, or omission likely to mislead consumers; (2) the consumers must be interpreting the message reasonably under the circumstances; and (3) the misleading effects must be 'material,' that is likely to affect consumers' conduct or decision with regard to a product," Int'l Harvester, 104 F.T.C. at 1056.

According to the FTC, omissions give rise to liability based on deception in two limited circumstances: (1) "to tell only half the truth, and to omit the rest" (e.g., "where a seller fails to disclose qualifying information necessary to prevent one of his affirmative statements from creating a misleading impression"); and (2) "to simply remain silent, if [the seller] does so under circumstances that constitute an implied but false representation" (e.g., where a misleading impression "arise[s] from the physical appearance of the product, or from the circumstances of a specific transaction, or . . . based on ordinary consumer expectations as to the irreducible minimum performance standards of a particular class of good").[11]  Id. at 1057-58.  An example of telling a half-

---

[11] We note the FTC's explanation that this second category of

-22-

truth and omitting the rest would be advertising a product that allegedly cures baldness but "failing to disclose that most baldness results from male heredity and cannot be treated." Id. at 1058 (citing Ward Labs. v. FTC, 276 F.2d 952 (2nd Cir. 1960); Keele Hair & Scalp Specialists, 55 F.T.C. 1840 (1959), aff'd, 275 F.2d 18 (5th Cir. 1960)). An example of creating a misleading impression through an omission would be presenting a product as new, even though it is actually used, without correcting the misimpression created, see id. (citing Olson Radio Corp., 60 F.T.C. 1758 (1962)), or omitting "that a simulated-wood product was actually made of paper," id. (citing Haskelite Mfg. Corp., 33 F.T.C. 1212, 1216 (1941), aff'd, 127 F.2d 765 (7th Cir. 1942)). Chapter 93A also requires that we look at federal case law interpreting the FTC Act. In 2018 the Ninth Circuit described the limits of the omission theory, holding that SeaWorld's failure to disclose facts about the poor treatment of its orca whales was not an unfair or deceptive act because such treatment "[did] not concern a central feature of the entertainment experience" inherent to the purchase of SeaWorld tickets. Hall v. SeaWorld Entm't, Inc., 747 F. App'x 449, 453 (9th Cir. 2018); see also

---

omissions is deceptive because it interferes with "[t]he concept of reasonable fitness," which is the notion that "offering a product for sale creates an implied representation that it is fit for the purposes for which it is sold." Int'l Harvester, 104 F.T.C. at 1058 & n.35.

F.T.C. v. Simeon Mgmt. Corp., 532 F.2d 708, 716 (9th Cir. 1976)
("[N]o single advertisement could possibly include every fact
relevant to the purchasing decision; nor is such comprehensiveness
required . . . .").

        Although the SJC did not cite directly to International
Harvester in the Aspinall decision, its statement in that case
regarding nondisclosures in advertising that are "half truth[s]"
or that "create an over-all misleading impression" closely tracks
the FTC's dual classification scheme.  Aspinall, 813 N.E.2d at
487.  In International Harvester, the FTC considered whether a
farming equipment manufacturer committed a deceptive act by
marketing a gasoline-powered tractor without a warning about a
potentially dangerous product feature that resulted in a
phenomenon called "fuel geysering" in which hot gasoline is
forcibly ejected through a cap on the tractor's gas tank.  See 104
F.T.C. at 1051-55.  The FTC classified this nondisclosure as a
"pure omission," which it defined as merely staying silent about
a subject "in circumstances that do not give any particular meaning
to [the] silence."  Id. at 1059.  Because the statistical
probability of fuel geysering was very low, the FTC determined
that the risk of hazard did not render the tractor "unfit for
normal use," and thus the act of offering the tractor for sale
while staying silent about the risk of fuel geysering did not

-24-

constitute a deceptive act.  _Id._ at 1063.  Thus, although pure
omissions "may lead to erroneous consumer beliefs if [the] consumer
had a false, pre-existing conception which the seller failed to
correct," the FTC held that such omissions, by and large, "are not
appropriately  characterized  as  deceptive  or  reached  through
deception analysis."  _Id._ at 1059-60.  The reasoning underlying
the FTC's treatment of pure omissions is encapsulated in the
following policy considerations:

> First, we could not declare pure omissions to be
> deceptive without expanding that concept virtually
> beyond limits.  Individual consumers may have
> erroneous preconceptions about issues as diverse as
> the entire range of human error, and it would be both
> impractical and very costly to require corrective
> information on all such points.  Second, pure
> omissions do not presumptively or generally reflect a
> deliberate act on the part of the seller, and so we
> have no basis for concluding, without further
> analysis, that an order requiring corrective
> disclosure would necessarily engender positive net
> benefits for consumers or be in the public interest.
>
> If we were to ignore this last consideration, and
> were to proceed under a deception theory without a
> cost-benefit analysis, it would surely lead to
> perverse outcomes.  The number of facts that may be
> material to consumers -- and on which they may have
> prior misconceptions -- is literally infinite.
> Consumers may wish to know about the life expectancy
> of clothes, or . . . [a] canner's policy on trade
> with Chile.  Since the seller will have no way of
> knowing in advance which disclosure is important to
> any particular consumer, he will have to make
> complete disclosures to all.  A television ad would
> be completely buried under such disclaimers, and even
> a full-page newspaper ad would hardly be sufficient
> for the purpose.  For example, there are literally
> dozens of ways in which one can be injured while

>       riding a tractor, not all of them obvious before the
>       fact, and under a simple deception analysis these
>       would presumably all require affirmative disclosure.
>       The resulting costs and burden on advertising
>       communication would very possibly represent a net
>       harm for consumers.

Id. at 1059-60 (footnotes omitted).

On this law, we see no reason to depart from the district court's determination that Tomasella failed to state a deceptive acts claim against Defendants based on their packaging omissions. As Tomasella does not pursue a theory premised on affirmative misrepresentations,[12] the decisive issue is thus whether Defendants' packaging omissions are deceptive acts in the sense that they "ha[ve] the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted (i.e., to entice a reasonable consumer to purchase the product)." Aspinall, 813 N.E.2d at 488.

By our lights, Defendants' packaging omissions lack the requisite capacity to mislead. The district court's classification

---

[12] Tomasella did allege in the Nestlé complaint that the company's failure to disclose abusive labor practices was especially egregious for Nestlé Crunch because the product includes a Nestlé Cocoa Plan label accompanied by the following statement: "The Nestlé Cocoa Plan works with UTZ Certified to help improve the lives of cocoa farmers and the quality of their products." The district court rejected the argument that this label constituted an affirmative misrepresentation, and because Tomasella does not challenge this ruling on appeal, she has therefore waived any argument to that effect. See Pignons S.A. de Mecanique v. Polaroid Corp., 701 F.2d 1, 3 (1st Cir. 1983).

-26-

of Defendants' packaging omissions as pure omissions makes good
sense.  The challenged conduct does not clearly fall into either
of the nondisclosure categories that the SJC and FTC have
specifically recognized as being deceptive.  By not disclosing on
the packaging of their chocolate products that there are known
labor abuses in their cocoa supply chains, Defendants stay silent
on the subject in a way that does not constitute a half-truth or
create any misleading impressions about the upstream labor
conditions in the cocoa supply chain. [13]

Following International Harvester's framework, then, the
risk of hazard -- here, that the worst forms of child labor may
have been used in producing the cocoa beans used to make the
chocolate products being offered for sale -- does not render the

---

[13] On appeal, Tomasella attempts to cobble together a misleading
impression theory by contending that Defendants' "omission[s]
relate[] to the central pleasure-providing characteristic of the
product, which is undermined by undisclosed child and slave labor,"
and that Defendants "create[] an implied but false impression in
the mind of a reasonable consumer" that their for-sale chocolate
products are in the country legally even though importing the cocoa
beans used to make those products violates the Tariff Act, 19
U.S.C. § 1307.  However, because Tomasella failed to raise these
arguments below, we decline to address them for the first time on
appeal.  See Goodwin v. C.N.J., Inc., 436 F.3d 44, 51 (1st Cir.
2006) ("Under the familiar raise-or-waive rule, legal theories not
asserted in the lower court cannot be broached for the first time
on appeal.").  For the first time on appeal, Tomasella also
contends that International Harvester supports her position
because, there, the FTC "did not dismiss the 'pure omission' in
that case outright, but found a violation under the FTC unfairness
test, as exists here."  But this last-minute argument is waived
too. See id.

products "unfit for normal use," and thus the act of offering the
chocolate for sale without mention of these labor practices is not
a deceptive act.   104 F.T.C. at 1063.   Moreover, the allegation
that Defendants did not correct at the point of sale Tomasella's
"false, pre-existing conception" that their chocolate products
were completely free of the worst forms of child labor does not
translate into deception liability.   Id. at 1059.   Without citing
any precedent, Tomasella argues that because the worst forms of
child labor are universally condemned, consumers acting reasonably
under the circumstances would never expect a product to implicate
such abhorrent labor practices.   We need look no further than the
FTC's stated policy rationales to explain the shortcomings of this
argument.   Declaring Defendants' packaging omissions to be
deceptive would inevitably "expand[] that concept virtually beyond
limits," considering the vast universe of "erroneous
preconceptions" that individual consumers may have about any given
product as well as "[t]he number of facts that may be material to
[them]."   Id. at 1059; cf. Animal Legal Defense Fund Bost., Inc.
v. Provimi Veal Corp., 626 F. Supp. 278, 279-81 (D. Mass. 1986)
(dismissing claim that veal producer acted deceptively and
unfairly by not telling consumers about the upstream mistreatment
of calves in its supply chain because Chapter 93A was an
"inappropriate remedy" for consumers to enforce Massachusetts'

-28-

animal cruelty laws), aff'd, 802 F.2d 440 (1st Cir. 1986).[14]

On appeal, however, Tomasella disputes the district court's decision to rely on FTC guidance in general and on International Harvester in particular. For support, Tomasella points to the SJC's recognition that "[a] duty exists under

---

[14] The dispute before us comes on the heels of several cases out of the Ninth Circuit rejecting variants of Tomasella's claims under California's consumer protection laws on similar grounds. See McCoy v. Nestlé USA, Inc., 173 F. Supp. 3d 954 (N.D. Cal. 2016) (dismissing claims that Nestlé violated California consumer protection laws by omitting information about labor abuses in its supply chain on the packaging of its chocolate products because this omission was not contrary to any representations made by the defendant or a fact that the defendant had a duty to disclose), aff'd, 730 F. App'x 462 (9th Cir. 2018); Dana v. The Hershey Co., 180 F. Supp. 3d 652 (N.D. Cal. 2016) (dismissing claims that Hershey violated California consumer protection laws by omitting any disclosure of labor abuses in its supply chain on the packaging of its chocolate products as this omission was not unlawful, unfair, deceptive, or fraudulent), aff'd, 730 F. App'x 460 (9th Cir. 2018); Hodsdon v. Mars, Inc., 891 F.3d 857 (9th Cir. 2018) (affirming dismissal of claims against Mars for violating California consumer protection laws by omitting any disclosure of labor abuses in its supply chain on the packaging of its chocolate products because Mars had no duty to disclose this information and the omission itself was not unethical or misleading); see also Wirth v. Mars, Inc., 2016 U.S. Dist. LEXIS 14552 (C.D. Cal. Feb. 5, 2016) (holding Mars did not violate California consumer protection laws by omitting any disclosure of labor abuses in its supply chain on the packaging of its cat food products because Mars had no duty to disclose this information and the safe harbor doctrine forecloses this claim through the California Transparency in Supply Chain Act of 2010), aff'd, 730 F. App. 468 (9th Cir. 2018); Barber v. Nestlé USA, Inc., 154 F. Supp. 3d 954 (C.D. Cal. 2015), aff'd, 730 F. App'x 464 (9th Cir. 2018); Hughes v. Big Heart Pet Brands, 2016 U.S. Dist. LEXIS 5508 (C.D. Cal. Jan. 15, 2016), aff'd, 740 F. App. 876 (9th Cir. 2018); De Rosa v. Tri-Union Seafoods, LLC, 2016 U.S. Dist. LEXIS 5497 (C.D. Cal. Jan. 15, 2016), aff'd, 730 F. App'x 466 (9th Cir. 2018).

-29-

[Chapter] 93A to disclose material facts known to a party at the time of a transaction," Exxon Mobil Corp. v. Att'y Gen., 94 N.E.3d 786, 797 (Mass. 2018) (quoting Underwood, 605 N.E.2d at 835), cert denied sub nom. Exxon Mobil Corp. v. Healey, 139 S. Ct. 794 (2019), in tandem with Section 3.16(2)'s broad disclosure language.  Based on this duty to disclose material facts, Tomasella argues that she "need only allege a knowing omission of material information likely to mislead consumers" in order to plausibly state a deception claim based on Defendants' omissions.[15]  In other words, Tomasella contends that "requiring disclosure in the absence of any [common law] duty to do so . . . is the equivalent of saying pure omissions are actionable" under Chapter 93A.  Tomasella also submits that we have already recognized that her allegations are sufficient to state a Chapter 93A claim in V.S.H. Realty v. Texaco, Inc., 757 F.2d 411, 417 (1st Cir. 1985), where we noted that "[we] [were] not convinced . . . that [the plaintiff in that case] need[ed] to allege more than a failure to disclose a material fact to state a cause of action under Chapter 93A."  Because of these "clear statements of law" regarding Chapter 93A's "inherent" disclosure

---

[15] By Tomasella's account, she has pleaded enough under the proposed approach to survive the motion to dismiss based on the allegations that chocolate consumers "were generally unaware of [the labor abuses] and reasonably assume otherwise," that "studies . . . indicate that abusive labor practices are material to consumers," and that she "would not have purchased the chocolate products had she known the truth" about their origins.

obligations, Tomasella submits that the district court need not
have consulted FTC caselaw at all, let alone <u>International
Harvester</u>.  For the following reasons, we disagree.

        First and foremost, the statutory directive in Chapter
93A to consult FTC and federal court interpretations of relevant
terms and standards is clear.  <u>See</u> Mass. Gen. Laws ch. 93A, § 2(b);
<u>see also</u> <u>Aspinall</u>, 813 N.E.2d at 487-88.

        Additionally, the supposed clear statements of
Massachusetts law to which Tomasella cites do not, in our view,
lend support to her position.  We begin with <u>Exxon</u>, which addressed
the very different issue of the scope of the Massachusetts Attorney
General's investigative power under Chapter 93A.  <u>See</u> <u>Exxon</u>, 94
N.E.3d at 791 ("[T]he Attorney General is statutorily authorized
to investigate whatever conduct she believes may constitute a
violation of [Chapter 93A]." (citing Mass. Gen. Laws ch. 93A,
§ 6(1))).  To lay out the facts, the Attorney General had launched
an investigation into Exxon for a potential Chapter 93A deceptive
acts violation when internal company documents surfaced showing
that Exxon knew about the climate risks associated with its product
(fossil fuels), failed to disclose that information to the public,
and "instead sought to undermine the evidence of climate change
altogether, in order to preserve its value as a company." <u>Id.</u> at
790.  Specifically, the Attorney General posited the following

-31-

failure-to-disclose theory: despite Exxon's "sophisticated internal knowledge" about the climate risks associated with the use of its fossil fuel products, the company "failed to disclose what it knew to . . . consumers," id. at 792, and thus, its incomplete marketing and advertising of those products to Massachusetts consumers potentially "created a misleading impression," id. at 795 (quoting Aspinall, 813 N.E.2d at 395). When, pursuant to its authority, the Attorney General issued a civil investigatory demand ("CID") to Exxon for "documents and information relating to [the company's] knowledge of and activities related to climate change," Exxon filed suit in state court to set aside the CID. Id. at 790.

Before the SJC, Exxon argued that, as a nonresident corporation, it was not subject to personal jurisdiction in Massachusetts, and that to the extent that the Attorney General's investigation (and thus the CID) arose from the company's advertising and marketing activities in Massachusetts, those activities were conducted by Exxon's franchisees (branded gas stations) whose communications could not be attributed to Exxon. Id. at 794. After agreeing with the lower courts' determinations that this argument belied the language of Exxon's brand franchise agreements, see id. at 794-95, the SJC concluded that the CID's request for information relating to Exxon's knowledge about the

-32-

climate risks of its products fell squarely within the Attorney
General's statutory authority to investigate whether Exxon had
indeed "engaged in deceptive advertising . . . by either giving a
misleading impression or failing to disclose material information
about climate change." Id. at 795.

     While we understand the attraction of drawing a parallel
to Exxon, there are no grounds for reading the case as establishing
the liberal pleading standard for which Tomasella advocates.
Rather, what the case confirms is that Chapter 93A authorizes the
Massachusetts Attorney General to investigate conduct that she
believes might amount to a Chapter 93A violation, see Mass. Gen.
Laws ch. 93A, § 6(1) (authorizing the Attorney General in
furtherance of her investigatory powers to "examine . . . any
documentary material of whatever nature relevant to such alleged
unlawful method, act or practice" and take testimony under oath),
and reinforces the jurisdictional norms to which the investigation
(including any CID issued in relation thereto) must adhere. As
the legal issues pertained to the Attorney General's powers during
the preliminary stages of a Chapter 93A investigation, the SJC did
not take (and indeed could not have taken) a position in Exxon as
to whether Exxon's nondisclosure constituted a deceptive act.
Therefore, we cannot extrapolate a rule from that narrow decision
that consumers (whose private right of action derives from a

-33-

different section of the statute, see Mass. Gen. Laws ch. 93A, § 9) plausibly state a deceptive acts claim simply by pleading that a company had knowledge of any potentially material information regarding one of its products but failed to disclose it.

Likewise, in our view, Underwood falls short of the broad applicability that Tomasella ascribes to it. There, the SJC considered whether an owner-broker was guilty of a deceptive act by failing to disclose "the possibility of lead-based paint in a residential dwelling to childless prospective tenants." 605 N.E.2d at 834. The SJC held that the owner-broker's nondisclosure did not violate Chapter 93A because the theory of his liability was premised on "a suspicion or a likelihood" that the house contained lead paint "rather than actual knowledge." Id. at 835. From this, Tomasella draws the conclusion that Chapter 93A's disclosure obligations extend to all nondisclosures of all known (as opposed to suspected) material facts. But we find no basis for such a broad deduction in the language of the decision.

Next, as the district court rightly noted, Section 3.16(2) cannot be fairly read as a carte blanche for Chapter 93A liability either. By its terms, the regulation provides for liability when a seller "fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have

influenced the buyer or prospective buyer not to enter into the transaction." 940 Mass. Code Regs. 3.16(2). Read literally, Section 3.16(2) would give rise to a nearly boundless disclosure obligation that exceeds even the breadth of Chapter 93A itself. Thus, the SJC has stated that despite the regulation's patently latitudinous language, it "adds little, if anything, to the provisions of [Chapter 93A] itself," Underwood, 605 N.E.2d at 836, which as we know, proscribes material, knowing, and willful nondisclosures that are "likely to mislead consumers acting reasonably under the circumstances," Mayer v. Cohen-Miles Ins. Agency, Inc., 722 N.E.2d 27, 33 (Mass. 2000). Furthermore, a pragmatic reading of the regulation is consistent with the SJC's recognition that "[t]he only limitations on [the Attorney General's] interpretive power are that his definitions [of unfair and deceptive] not be inconsistent with FTC and Federal court decisions . . . and the usual limitations that his regulations be neither arbitrary nor capricious." Purity Supreme, Inc. v. Att'y General, 407 N.E.2d 297, 304 (Mass. 1980). Additionally, it tracks the original intent behind drafting Chapter 93A with open-ended language, which was "to allow for the regulation of future, as-yet-undevised, business practices." Id. at 303-04 (citing Commonwealth v. DeCotis, 316 N.E.2d 748, 754 (Mass. 1974)). Thus, we are hard-pressed to interpret Section 3.16(2) as mandating the

-35-

disclosure that Tomasella seeks, even in the context of the Massachusetts case law that she cites.

Lastly, Tomasella's reliance on an isolated statement from our decision in V.S.H. Realty goes nowhere. That case implicated the "as is" purchase of "a used bulk storage petroleum facility," for which the seller (Texaco) represented that it had not received any notice from government entities "regarding modifications or improvements to the facility or any part thereof" and only disclosed an oil seepage in the garage building. V.S.H. Realty, 757 F.2d at 413. After discovering a second oil seepage, which the U.S. Coast Guard had previously sought to investigate, the buyer (V.S.H.) filed suit against Texaco alleging, inter alia, that the company violated Chapter 93A by failing to disclose the second oil leak. See id. On the narrow issue of disclosure obligations created by Chapter 93A, including Section 3.16(2), we reversed the district court's decision, which found that the nondisclosure of the property defect was lawful absent an independent duty to speak, even if that information would have influenced the buyer's decision to enter the purchase agreement. See id. at 416. Tomasella hangs her hat on a component of our reasoning in that case, in which we stated that "[we] [were] not convinced . . . that V.S.H. need[ed] to allege more than a failure to disclose a material fact to state a cause of action under

-36-

Chapter 93A" in light of the SJC's emphasis on the difference between statutory and common law causes of action for fraud and deceit, the latter of which requires a duty to disclose.  Id. at 417 (citing Slaney v. Westwood Auto, Inc., 322 N.E.2d 768 (Mass. 1975)).  However, our reasoning was two-pronged, and the cited statement was preceded by our observation that, even accepting the pleading requirement of a disclosure duty, "V.S.H. ha[d] met its burden of establishing a duty by alleging that Texaco made partial or incomplete statements regarding the oil leaks on the property." Id. (citing Restatement (Second) of Torts §§ 521, 529).  In other words, our holding in V.S.H. Realty was inextricably linked to the facts of the case, which involved misleading half-truths relating to the reasonable fitness of the property, and thus are plainly distinguishable from those of Tomasella's case.

Next, maintaining that it was error to consult FTC caselaw at all, Tomasella also contends the district court was doubly misguided in consulting International Harvester because the SJC had previously looked to another FTC case, In re Cliffdale Assoc., Inc., 103 F.T.C. 110 (1984) (hereafter "Cliffdale"), for guidance on deception liability analysis.  We find this argument unavailing as well.

Tomasella notes specifically that in Aspinall, the SJC looked to Cliffdale, from which it imported the FTC standard for

-37-

gauging deceptive acts: "if, first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." Aspinall, 813 N.E.2d at 487 (quoting Cliffdale, 103 F.T.C. at 165). She fails to recognize, however, that International Harvester recounts the exact same standard, both FTC cases deriving it from the same 1983 FTC policy statement. See Int'l Harvester, 103 F.T.C. at 1056 & n.18. In any event, in Cliffdale, the FTC held that marketers of a car engine had engaged in unlawful deceptive acts by placing advertisements and distributing sales materials that made false and misleading claims about the value and performance of the engine. Id. at 161-62. Given the context, it makes sense that the SJC would cite the mention of the deception standard in Cliffdale (as opposed to International Harvester) in the Aspinall decision, where the plaintiffs alleged that a cigarette company violated Chapter 93A by "marketing . . . Marlboro Lights as 'light' cigarettes that deliver 'lowered tar and nicotine'" despite having intentionally designed "light" cigarettes to deliver as much, if not more, tar and nicotine than regular cigarettes. 813 N.E.2d at 479. By contrast, Tomasella does not allege that Defendants intentionally made false and misleading statements in their advertisements or marketing materials for the chocolate products.

Instead, as in International Harvester, the heart of the dispute at hand centers around whether Defendants' staying silent on the packaging of the chocolate products at the point of sale about upstream labor practices in their cocoa supply chains constitutes a deceptive act.

To be sure, Cliffdale did implicate a deceptive nondisclosure, which arose from the marketers' use of advertisements with consumer testimonials that created the impression that the endorsements were made by actual users of the car engine and were thus "unrestrained and unbiased." 103 F.T.C. at 171. As it turned out, "a good number" of the individuals whose testimonials were featured in the marketing materials were actually "business associates" of the marketers, not actual product users. Id. at 172. The FTC concluded that the marketers were "guilty of making a deceptive claim" because failing to disclose the relationship between the endorser and the seller had created a false and misleading impression in the minds of consumers, who were particularly gullible because of the difficulty that average consumers have in assessing a product like a car engine themselves. Id. The SJC echoed this ruling in Aspinall, where it stated that advertising may be deceptive when it "create[s] an over-all misleading impression through failure to disclose material information." 813 N.E.2d at 487. This does

not, however, speak to the deceptive character of omissions like the ones at issue here, which is precisely why <u>International Harvester</u> provides a useful reference point.

Therefore, we hold that Tomasella has not plausibly stated a Chapter 93A deception claim.  We now turn to her second theory.

### 2.  Unfair Acts

Tomasella also challenges the dismissal of her Chapter 93A unfairness claim.  "An act or practice may be 'unfair' within the statutory meaning [of Chapter 93A] without being deceptive or fraudulent." <u>Mass. Farm Bureau Fed'n, Inc.</u> v. <u>Blue Cross of Mass., Inc.</u>, 532 N.E.2d 660, 664 (Mass. 1989). "[A] practice or act will be unfair under [Chapter 93A], if it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to [consumers,] competitors or other business people." <u>Heller Fin.</u> v. <u>Ins. Co. of N. Am.</u>, 573 N.E.2d 8, 12-13 (Mass. 1991).  Under this rubric, the legality of the challenged act or practice is not dispositive of its unfairness.  <u>See</u> <u>Mechs. Nat'l Bank of Worcester</u> v. <u>Killeen</u>, 384 N.E.2d 1231, 1237 (Mass. 1979).  In Massachusetts, the finder of fact determines "what constitutes an unfair trade practice," but its determination is nevertheless "subject to [a

-40-

reviewing] court's . . . legal gate-keeping function." Mass. Eye
& Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 69
(1st Cir. 2009).

        Tomasella disputes the district court's determination
that she failed to plausibly plead any of the three prongs.  With
respect to established concepts of unfairness, Tomasella
challenges the district court's "unduly narrow reading of [her]
claims" as resting only on Defendants' omission of information on
their product packaging about the use of cocoa supply chains with
known child and slave labor and not also the actual "utilization
of the abusive supply chain[s]."  By Tomasella's assessment, her
unfair act claims necessarily encompass both practices, which in
her view, "go hand in hand."  Tomasella further contends, relying
on our decision in Cooper v. Charter Commc'ns Entm'ts I, LLC, 760
F.3d 103, 111 (1st Cir. 2014), that "to fall within the penumbra
of a statute's concept of unfairness, [the challenged practice]
need not actually violate the statute." Accordingly, she clarifies
that it is her position that Defendants' "utiliz[ation] of supply
chains with known child and slave labor" together with their
continued failure to implement the cocoa certification standards
set forth in the Harkin-Engel Protocol puts their practice of
nondisclosure squarely within the penumbra of the "international
intolerance of slavery and child labor abuses," as expressed by

-41-

the UDHR and ILO Convention No. 182.  Even if a statutory violation
were required to plausibly state a Chapter 93A unfairness claim,
Tomasella submits that the Tariff Act, 19 U.S.C. § 1307, which
prohibits the importation of goods from supply chains that rely on
forced labor,[16] provides the necessary hook when taken together
with her allegations that Defendants import cocoa beans and paste
from West Africa.

      The challenged conduct does not fall within the penumbra
of any recognized concept of unfairness.  The Chapter 93A claims
at issue are not based on Defendants' conduct of sourcing cocoa
beans from a supply chain rife with child labor abuses.  While
Tomasella undoubtedly pleads numerous facts relating to the
abhorrence and prevalence of the worst forms of child labor in
West African cocoa supply chains, as well as Defendants' knowledge
of and profiting from that practice, functionally, Tomasella

---

[16] In relevant part, the Tariff Act provides:

> All goods, wares, articles, and merchandise mined,
> produced, or manufactured wholly or in part in any
> foreign country by convict labor or/and forced or/and
> indentured labor under penal sanctions shall not be
> entitled to entry at any of the ports of the United
> States, and the importation thereof is hereby
> prohibited, and the Secretary of the Treasury is
> authorized and directed to prescribe such regulations
> as may be necessary for the enforcement of this
> provision.

19 U.S.C. § 1307.

relies on these facts only as predicates for her consumer protection argument.[17]  Those allegations do not bring the omission within the penumbra of common-law unjust enrichment, as described in greater detail below.  And, at any rate, the SJC has never upheld a Chapter 93A claim because its allegations made out a claim for unjust enrichment, much less because its allegations were in the penumbra of unjust enrichment.

Next, we have reason to doubt that Massachusetts state law would look to broad notions of international law, much less to concepts of unfairness.  Tomasella's arguments in this regard, even if countenanced, would nevertheless fail on their merits because she has not provided sufficient information in her pleadings to establish that such packaging disclosures fall within the penumbra of the UDHR or ILO Convention No. 182.[18]

---

[17] By way of comparison, plaintiffs in another forum have challenged at least one of the Defendants' complicity in the underlying labor abuses directly.  See Doe v. Nestlé, S.A., 929 F.3d 623, 637, 642 (9th Cir. 2018) (holding that defendants' perpetuation of overseas slave labor from their U.S. headquarters provided a sufficient domestic nexus for former child slaves trafficked into Côte d'Ivoire to proceed on their claims against defendants under the Alien Tort Statute, 28 U.S.C. § 1350, for aiding and abetting slave labor), petition for cert. filed, No. 19-416 (Sept. 27, 2019).

[18] Not even the United Nations' Guiding Principles on Business and Human Rights -- a set of guidelines delineating the corporate responsibility to respect human rights that references the UDHR and ILO Convention No. 182 -- extend to point-of-sale disclosures on products that implicate human rights violations.  See Office of the U.N. High Commissioner on Human Rights, U.N. Guiding

As to statutory concepts of unfairness, Tomasella's argument that the challenged packaging omissions fall within the penumbra of the Tariff Act fare no better, even assuming arguendo that a violation of a federal statute could be a source of unfairness within the meaning of Chapter 93A. By its terms, the Tariff Act only regulates the importation of goods, and thus plainly does not extend to point-of-sale packaging disclosures -- not to mention that its enforcement is committed to the discretion of the Secretary of the Treasury.[19]   See 19 U.S.C. § 1307. Defendants' packaging omissions do not fall within the penumbra of any established concepts of unfairness.

Regarding the remaining unfairness prongs, Tomasella maintains on appeal that Defendants' nondisclosure is both "immoral and substantially injurious to consumers who suffer

---

Principles on Business and Human Rights: Implementing the United Nations "Protect, Respect and Remedy" Framework, 13-26, U.N. Doc. HR/PUB/11/04 (2011). Rather, the Guiding Principles encourage businesses to make "publicly available" a policy statement "express[ing] their commitment to meet this responsibility," id. at 16-17, and when their "operations . . . pose risks of severe human rights impacts" to "communicate this externally" by "report[ing] formally on how they address [the impacts]," id. at 23-24.

[19] Even the one-of-its-kind California Transparency in Supply Chain Act, Cal. Civ. Code § 1714.43(a)(1), does not provide a statutory hook because it only goes so far as to require website disclosures about companies' "efforts to eradicate slavery and human trafficking from [their] direct supply chain for tangible goods offered for sale."

economic loss" and are made to "unwittingly support abusive labor practices" by buying chocolate products.  Because Massachusetts law requires sellers to disclose material information absent an independent duty, and because "reasonable Massachusetts consumers assume that major American companies do not tolerate internationally condemned labor abuses in their supply chains," Tomasella argues that it is therefore "unethical to take advantage of [those] . . . assumptions and thereby trick consumers into becoming unwitting participants in the proliferation of child and slave labor."

Along those lines, Tomasella disputes the district court's finding that it was neither immoral or substantially injurious to consumers for Defendants to omit information about their supply chain abuses "on [their] actual product packaging" when they "had made such information readily available to consumers on [their] websites."  Tomasella submits that consumers "cannot be expected to conduct internet research on every item they purchase -- particularly inexpensive goods at the market," and therefore, absent a showing that she, or the putative class members, have actually seen any of Defendants' website disclosures, the onus should be on the seller to "readily ensure exposure with a label disclosure."

On balance, Tomasella has not persuaded us that the

nondisclosure of upstream labor conditions on product packaging at the point of sale is unscrupulous or substantially injurious to consumers within the meaning of Chapter 93A.  Again, we must separate the undisputed immorality of the alleged underlying conduct, which we do not take lightly, from the challenged nondisclosures.  Cf. Hodsdon, 891 F.3d at 867 (holding that while child labor is "clearly immoral," the notion that omitting descriptions of those labor practices at the point of sale is immoral within the California consumer protection context is "doubtful").  The pleadings do not provide any basis on which to conclude that Defendants have tricked consumers or taken advantage of their assumptions for capital gain.  And as to substantial injury, the hard truth with which society must reckon is that consumers actually benefit from the prevalence of forced child labor in cocoa bean supply chains because it makes chocolate cheaper. This is precisely why, as Tomasella herself acknowledges, consumers are willing to pay premiums for products that are certified with fair-trade labels.  Indeed, the very existence of fair-trade labels, and their absence from Defendants' chocolate products, may well convey to consumes who care greatly about such matters that these products are not the result of fair-trade practices.  Finally, the fact that Defendants have repeatedly made information about the prevalence of the worst forms of child labor

-46-

in their supply chains publicly available through their websites and other media mitigates the concern raised that their omission at the point of sale is unethical per Chapter 93A regardless of whether Tomasella or the putative class members were (or should have been) cognizant of Defendants' website disclosures. Otherwise the list of information that sellers would have to disclose on their product packaging would be lengthy indeed.  <u>See Int'l Harvester</u>, 104 F.T.C. at 1059-60.

Therefore, we hold that Tomasella has not plausibly stated a Chapter 93A unfairness claim.  Accordingly, we affirm the dismissal of her Chapter 93A claims for failure to state a claim upon which relief can be granted.[20]

## B.  Unjust Enrichment

We now turn to the second count of Tomasella's complaints.  "Unjust enrichment is defined as 'retention of money or property of another against the fundamental principles of justice or equity and good conscience.'"  <u>Santagate</u> v. <u>Tower</u>, 833 N.E.2d 171, 176 (Mass. App. Ct. 2005).  To plausibly state a claim for unjust enrichment, the plaintiff must allege: "(1) a benefit

---

[20] Having affirmed the dismissal of the Chapter 93A claims for Tomasella's failure to plausibly state a claim for relief, we need not address at this juncture whether she has pleaded a cognizable injury per section 9 of Chapter 93A or whether the disclosures she seeks would violate Defendants' First Amendment rights.

conferred upon the defendant by the plaintiff; (2) an appreciation
or knowledge by the defendant of the benefit; and (3) acceptance
or retention by the defendant of the benefit under the
circumstances would be inequitable without payment for its value."
Mass. Eye & Ear Infirmary, 552 F.3d at 57 (citation omitted).
Unjust enrichment is an equitable remedy, which "exist[s] to
supplement those available at law and not to contradict the
judgments embodied in the statutes and the common law." Stevens
v. Thacker, 550 F. Supp. 2d 161, 165-66 (D. Mass. 2008).  Thus,
"a party with an adequate remedy at law cannot claim unjust
enrichment." Shaulis, 865 F.3d at 16 (citing ARE-Tech Square, LLC
v. Galenea Corp., 79 N.E.3d 1111 (Mass. App. Ct. 2017)).
Specifically, "[i]t is the availability of a remedy at law, not
the viability of that remedy, that prohibits a claim for unjust
enrichment." Id. at 16.

Tomasella argues that the district court erroneously
relied on the availability versus viability language in Shaulis to
dismiss her unjust enrichment claim.  She contends that our
decision in Lass v. Bank of America, N.A., 695 F.3d 129, 140 (1st
Cir. 2012) (holding that a plaintiff may "plead alternative and
even inconsistent legal theories, such as breach of contract and
unjust enrichment, even if Plaintiffs only can recover under one
of these theories"), which we reiterated in Cooper, 760 F.3d 103,

-48-

is controlling under the law of the circuit doctrine because it predates Shaulis. We disagree.

Under the "law of the circuit" rule, "newly constituted panels in a multi-panel circuit court are bound by prior panel decisions that are closely on point." San Juan Cable LLC v. P.R. Tel. Co., 612 F.3d 25, 33 (1st Cir. 2010) (citation omitted). But Tomasella misapprehends the doctrine. She contends that because both Lass and Shaulis reached opposite conclusions regarding a plaintiff's ability to proceed on an unjust enrichment claim while citing the same precedent in support of their reasoning, see Platten v. HG Berm. Exempted Ltd., 437 F.3d 118, 130 (1st Cir. 2006) ("Massachusetts law does not allow litigants to override an express contract by arguing unjust enrichment."), Lass must take precedence as the earlier decision. Not so.

First, we are bound by Shaulis because it is a prior panel decision that is closely on point. To illustrate Shaulis's applicability, we lay out its facts. The case involved a putative class action lawsuit stemming from Nordstrom's practice of listing a "Compare At" price alongside the sale price on price tags for items at its department store, Nordstrom Rack. See 865 F.3d at 5. In that case, the named plaintiff (Shaulis) sued Nordstrom after purchasing one of its sweaters with a price tag listing the purchase price as $49.97 and the "Compare At" price as $218,

-49-

indicating "77% worth of savings," when in actuality, the goods available for purchase at Nordstrom Rack were "manufactured by designers for exclusive sale" at Nordstrom's department stores, meaning that they were never sold at the advertised "Compare At" prices.  Id. (internal quotation marks omitted).  On behalf of a putative class including all consumers who purchased items from Nordstrom Rack, Shaulis alleged that the "Compare At" pricing scheme constituted an unfair or deceptive act under Chapter 93A by "induc[ing] [her] to make a purchase she would not have made, but for the false sense of value [it] created."  Id. at 10.  She also alleged claims for fraud, breach of contract, and unjust enrichment.  See id. at 5.

We ultimately affirmed the dismissal of Shaulis's Chapter 93A claims for failure to adequately allege a legally cognizable injury under the state statute, see id. at 15, as well as the dismissal of her fraudulent misrepresentation and breach of contract claims, see id. at 15-16.  As to her unjust enrichment claim, we held that it must also be dismissed because, even though she did not succeed on her Chapter 93A, fraudulent misrepresentation, and breach of contract claims (i.e., even though they were not viable), they provided her with "an adequate remedy at law" (i.e., they were available to her), and that alone "prohibits a claim for unjust enrichment."  Id. at 16 (citing Reed

-50-

v. Zipcar, Inc., 883 F. Supp. 2d 329, 334 (D. Mass. 2012), aff'd, 527 F. App'x 20 (1st Cir. 2013); Fernándes v. Havkin, 731 F. Supp. 2d 103, 114 (D. Mass. 2010) (holding plaintiff's unjust enrichment claim was precluded by co-existent Chapter 93A claim, which was dismissed for failure to state an unfair or deceptive act)).  The same is true here.  The viability of Tomasella's Chapter 93A claims is "beside the point." Reed, 883 F. Supp 3d. at 334.  Tomasella's unjust enrichment claims must be dismissed because an adequate remedy at law was undoubtedly available to her through Chapter 93A.

Next, we do not read Lass and Shaulis as creating an untenable conflict of law.  Lass involved a dispute over whether a bank that acquired the plaintiff's mortgage wrongfully increased flood insurance payments beyond what was originally required by the mortgage agreement.  695 F.3d at 131-134.  The plaintiff in that case brought a breach of contract and unjust enrichment claim (among others) against the bank, which the district court dismissed for failure to state a claim.  Resolving the breach of contract issue on appeal turned on the interplay between the relevant provision of the mortgage agreement and a separate document called the "Flood Insurance Notification" regarding the authority provided to the lender to demand increased flood coverage on the plaintiff's property.  Id.  Because we concluded that the two documents, when taken together, created an ambiguity regarding the

bank's authority to demand increased flood coverage, we reinstated the plaintiff's breach of contract claim. Id. at 137. As Tomasella notes, we also reinstated the plaintiff's unjust enrichment claim on the grounds that, despite the mutual exclusivity of damages for breach of contract and unjust enrichment, "it is accepted practice to pursue both theories at the pleading stage." Id. at 140 (citing Vieira v. First Am. Title Ins. Co., 668 F. Supp. 2d 282, 294-295 (D. Mass. 2009)). However, what Tomasella misses is that the ambiguity in the mortgage contract casts doubt on whether a breach of contract claim was indeed available as a legal remedy for the plaintiff in that case. Thus, we reinstated the unjust enrichment claim, so that the district court could determine anew whether the claim "should survive" once it had the chance to develop the factual record more fully. Id. at 141.

By contrast, in Shaulis, because no such ambiguity existed, we were able to determine that "[b]y charging the agreed price in exchange for ownership of the sweater, Nordstrom fulfilled its contractual obligations," which in turn, blocked the plaintiff from asserting an unjust enrichment claim on top of a breach of contract claim. 865 F.3d at 16. There is no such ambiguity in Tomasella's case either. Thus, absent any showing that Chapter 93A provides an insufficient remedy at law, Tomasella's Chapter

-52-

93A and unjust enrichment claims are mutually exclusive.[21]

Accordingly, we affirm the district court's dismissal of Tomasella's unjust enrichment claims.

### III.   Conclusion

For the foregoing reasons, we affirm the dismissal of Tomasella's complaints against Nestlé, Mars, and Hershey.

**Affirmed.**

---

[21] Even if Tomasella could pursue her unjust enrichment claims, we doubt she would succeed, for as we have already determined, the allegedly unjust conduct upon which her theory rests is neither deceptive nor unfair.